**Kimberly Scott MANNING, Appellant**

v.

**Charles C. WILLETT, Appellee.**

**No. 2005–CA–001620–DG.**

Court of Appeals of Kentucky.

April 20, 2007.

Lisa A. Beran, Kentucky Domestic Violence Association, Frankfort, KY, for appellant.

No Brief filed for appellee.

Before COMBS, Chief Judge; MOORE and NICKELL, Judges.

*OPINION*

MOORE, Judge.

This court granted Appellant Kimberly Scott Manning's motion for discretionary review of the circuit court's order which affirmed the district court's *sua sponte* order for a mutual domestic violence order.[1] In that the domestic violence statutes do not provide for mutual domestic violence orders under the factual scenario set forth below, we vacate and remand for dismissal.

Kimberly and Charles C. Willett have a child in common. Their son was born on September 15, 2003. Two months later on November 17, 2003, Charles was arrested by local police on the charges of assault

---

1. Appellee did not file a brief in this matter.

fourth-degree (KRS 508.030) and two counts of terroristic threatening (KRS 508.080). Kimberly stated that Charles was drunk, choked her, beat her on the head, threatened to take the baby and burn their trailer. He also slammed her into the refrigerator, knocked her to the floor and threatened to kill Kimberly's mother. Although the police had filed criminal charges, Kimberly also sought and obtained an Emergency Protective Order (EPO).

Charles pled guilty to the criminal charges and was sentenced to 30 days in jail, probated for 24 months, on the condition that he cause no further problems for Kimberly. Kimberly did not appear at the domestic violence hearing, and the EPO case was dismissed.

Several months later on May 26, 2004, Charles again assaulted Kimberly. This time he choked her and threatened to cut her throat with the knife he was wielding. Kimberly managed to escape and run to a neighbor's house to call the police. The police responded and arrested Charles on charges of assault fourth-degree (KRS 508.030), terroristic threatening (KRS 508.080) and criminal mischief third-degree (KRS 512.040). Kimberly again sought and obtained an EPO. At the EPO hearing the court entered a domestic violence order (DVO) requiring Charles to have no contact with Kimberly and to stay at least 1,000 feet away from her and members of her family. On the criminal charges he was sentenced to 60 days probated for two years and his prior 30 days probated sentence was revoked, and he was ordered to serve those days in the county jail.

A little over two months later, on August 9, 2004, the police were again called to Kimberly's residence. The fire depart-

ment also responded because Charles had started a fire in the front yard and was burning Kimberly's possessions while threatening to again burn the trailer. When the police arrived, Charles threatened to shoot them and to "whip their ass." Charles was arrested for violation of the DVO and for terroristic threatening. For some unexplained reason, the police also arrested Kimberly and charged her with violating the DVO which she had obtained.[2] Kimberly spent the night in jail and was then released on bond with the condition that she have no contact with Charles.

Both Charles and Kimberly appeared in district court on August 18, 2004. Charles pled guilty to violation of the DVO, his probation from the prior criminal charges was revoked and he was ordered to serve 45 days. On the new criminal charges he was sentenced to serve 120 days, probated for 24 months, and again ordered to have no contact with Kimberly. Charles then left the courtroom with his attorney.

When Kimberly's case was called, the court stated: "I'm going to dismiss the criminal charges against you, ma'am, because there is no DVO in effect. So, therefore, you can't be charged with violating one. But I'm issuing a domestic violence order right now, and I'm going to order you to stay away from him. And the next time, if you violate that order, you will go to jail." Kimberly responded, "Okay." And then the court added, "And it doesn't do you any good to come in here and ask for the protection of the court and have me order him to stay 1,000 feet away if you're going to invite him to come back over. It makes no sense. And we're all wasting our time if that's the case. It will

**2.** *See* KRS 403.785(2) Duties of Law Enforcement Agencies. When police respond to incidents of actual or suspected domestic violence, they are to assist and protect the victim of domestic violence.

remain in effect for three years, till August 17 of 2007. You're to stay 1,000 feet away from him and to have no contact with him." The court then entered a DVO for Charles against Kimberly finding "that it was established, by a preponderance of the evidence, that an act(s) of domestic violence or abuse has occurred and may again occur[.]"

Kimberly timely appealed to the Marion Circuit Court. On June 29, 2005, the Marion Circuit Court entered an Opinion and Order affirming the district court's order that entered the DVO against Kimberly. In the opinion and order the circuit court stated the following:

> Appellant is correct that the Legislature clearly stated its inten[t] regarding the Domestic Violence and Abuse statutes. KRS 403.715 mandates that the Courts effectuate these purposes. Appellant cites (1) but ignores (2) which cites the following legislative purpose: "to expand the ability of law enforcement officers to effectively respond to situations involving domestic violence and abuse so as to prevent further such incidents and to provide assistance to the victims."

> Appellant asserts that a court may issue mutual protect orders *only* if a separate petition is filed by the Respondent. KRS 403.735(2). However, this statute addresses the court's ex parte actions upon filing of a petition and *prior* to any hearing. Following the hearing upon the allegations, the Court has authority to "enter other orders the court believes will be of assistance in eliminating future acts of domestic violence and abuse." KRS 403.750(1)(h). Furthermore, under the statutory scheme, the Court clearly has continuing jurisdiction over its orders and its terms. The case below was before the Court for proceedings after the KRS 403.745 hearing upon a petition.

Appellant complains that her constitutional right to due process was violated by entry of the DVO. She fails to state how she was deprived of life, liberty or property. Apparently, the Appellant thinks that she has a constitutional right to commit an act of violence or abuse without the restraints of a protective order against such acts.

Appellant asserts that she was denied procedural due process protections including notice and opportunity to be heard. Clearly, this is not correct. The police arrested both Charles and Kim for the offense Violation of a Protective Order. Thus, she had notice that the DVO terms would be the issue before the Court. Appellant was released from custody after an overnight in jail and the Court appearance was another eight days later. Thus, she had the opportunity to seek counsel. The Court acted at the arraignment, not ex-parte. Thus, she had the opportunity to be heard. Appellant was afforded the same procedural protections as any Respondent to a domestic violence petition prior to the entry of a protective order.

Appellant argues that the courts should send a strong message that it takes domestic violence seriously and considers it in the best interest of society to intervene to protect the victim. That is exactly what the trial court did. Yet, the Appellant has resisted that intervention by having contact with Willett in circumvention of the protective order which Appellant sought. Clearly, the trial court found that the Appellant's contempt for the previous DVO resulted in further acts of violence or abuse.

This Court finds that the trial court correctly applied the law in entry of the further orders on August 18, 2004.

THEREFORE, it is hereby Ordered and Adjudged that the judgment of the Marion District Court is AFFIRMED.

Kimberly then sought discretionary review with this court. On October 17, 2005, a three judge panel of this court granted Kimberly's motion, and this matter is now before this court on discretionary review.

■ This court is fully aware of the many problems faced by trial judges relating to the domestic violence statutes set forth in KRS 403.700 et. seq. These problems include the failure of the petitioner to follow through with a petition once filed, and as is this case, when the petitioner initiates contact with the respondent following a no-contact order being entered. However, despite these concerns and numerous others, the trial court is bound to comply with the statutes. KRS 403.735(2) specifically states that a court may issue mutual protective orders *only* if a separate petition is filed by the respondent. That did not occur in this case, and the district court erred by entering a *sua sponte* mutual protection order against Kimberly. The circuit court affirmed the issuance of the mutual protective order relying on KRS 403.750(1)(h). That particular statute, in relevant part, states:

(1) Following the hearing provided for under KRS 403.740 and 403.745, the court, if it finds by a preponderance of the evidence that an act of or acts of domestic violence and abuse have occurred and may occur again, may:

. . .

(h) [e]nter other orders the court believes will be of assistance in eliminating future acts of domestic violence and abuse.

Clearly KRS 403.750 applies to orders entered following a hearing after a petition pursuant to KRS 403.725 has been filed.

*See S.L.T. v. R.J.C.*, 196 S.W.3d 530, 532 (Ky.App.2006).

In this case Kimberly filed a petition against Charles alleging he committed acts of violence and abuse against her. A hearing was held, and the court made findings that Charles had committed domestic violence against Kimberly and ordered him to stay 1,000 feet away from her along with other conditions to protect Kimberly from being abused. Charles never filed a petition and never alleged Kimberly committed acts of violence or abuse. As such the district court erred in entering a domestic violence order against Kimberly, and the circuit court erred in affirming such order.

The circuit court also claims that KRS 403.715(2) supports the court's reasons for entering a mutual protective order. However, again it misinterpreted the clear meaning of the statute. KRS 403.715 in relevant part states:

KRS 403.715 to 403.785 shall be interpreted by the courts of the Commonwealth of Kentucky to effectuate the following express legislative purposes:

(1) To allow persons who are victims of domestic violence and abuse to obtain effective, short-term protection against further violence and abuse in order that their lives shall be as secure and as uninterrupted as possible;

(2) To expand the ability of law enforcement officers to effectively respond to situations involving domestic violence and abuse so as to prevent further such incidents *and to provide assistance to the victims;* (emphasis added).

Again, we emphasize that Charles had a domestic violence order against him, and Kimberly was the victim of his domestic violence and abuse. The stated legislative purpose is to stop the abuser from committing further acts of violence and to assist the victim. In this case the police arrested Charles and charged him with several

criminal offenses based upon his actions. Kimberly was not charged with a criminal offense because she did not commit a crime, but rather she was a victim of criminal activities.

Obviously, the court was frustrated by the fact that it appeared to the court that Kimberly either invited Charles into her home or at least permitted him into it. Based upon the perception (rightly or wrongly), the court felt compelled to enter a domestic violence order against Kimberly. While we can understand the trial court's belief that its order might assist in preventing the two parties from having further contact, there is simply no provision in the law that permits the court to enter a mutual protective order under these circumstances. The DVO had been issued against Charles, and he was under court order to have no contact with Kimberly and to stay 1,000 feet away from her. He violated the order, and he was properly arrested and brought before the court for his contemptuous and criminal behavior.

Having thoroughly reviewed this matter, we believe Kimberly's appellate brief sheds significant light on the physical and psychological process many domestic violence victims struggle through. And, it sets forth important resources which should be considered by the courts when entering DVO. As such we cite with approval that portion of her brief as follows:

> While the Court might understandably be frustrated by the fact that victims of domestic violence often continue to have contact with the perpetrators of

the violence, the reality is that leaving a violent relationship is often a complex process for them. In most instances, a protective order is the first legal intervention in a domestic violence case. As such, protective orders send a strong message to the victim, the abuser, and the community that the court takes domestic violence seriously and considers it in the best interest of society to intervene to protect the victim while holding the abuser fully accountable.[3] It is vitally important for this message to be unequivocal, given that most victims are only able to escape from an abusive situation after several attempts to do so, and in fact subject themselves to greater risk of physical harm by attempting to leave the relationship.[4] Various studies have shown that murders of battered women are "often triggered by a walk-out, a demand, a threat of separation [which] were taken by the men to represent intolerable desertion, rejection and abandonment. Thus ... the threat of separation is usually the trigger for violence."[5] Unwarranted mutual orders may actually place the victim in more danger than she would be had she never sought an order. The perpetrator may feel like his actions have been, to a certain extent, condoned, while victims may lose faith in the system and will often refuse to call the police or seek further assistance from the courts when they are again abused out of fear that they will be arrested for violating the order. This fear is not unreasonable

**3.** *See generally, e.g.,* Catherine E. Klien & Leslye E. Orloff, *Providing Legal Protection for Battered Women: An Analysis of State Statutes and Chase Law,* 21 Hofstra L.Rev. 901 (1993).

**4.** *See* L. Okun, *Termination or Resumption of Cohabitation in Woman Battering Relationship: A Statistical Study,* reported in *Coping with Family Violence: Research and Policy Perspectives* 113 (G. Hotaling et al., eds.1988);

*See also* Special Report, *Violence Against Women: Estimates From The Redesigned Survey,* Bureau of Justice Statistics at 4 (Aug. 1995).

**5.** Maryanne E. Kampmann, *The Legal Victimization of Battered Women,* 15 Women's Rts. L. Rep. 101, 104 (1993).

given that law enforcement is often confused concerning how they are to respond to alleged violations of mutual DVOs.[6] The reality of confusion by law enforcement is also why Kentucky's statute on the issuance of mutual orders requires that they be written "sufficiently specific to appraise any peace officer as to which party has violated the order if there is probable cause to believe a violation of the order has occurred." KRS 403.735(2).

A victim who has placed herself at risk by seeking judicial intervention should not be treated like a criminal by the system charged with her protection. A victim who is brave enough to petition the court for a protective order, and then finds her own conduct restrained when she has neither committed a crime nor been subject to a counter petition, will lose faith in the judicial system. Without the faith that the system can help them, many victims would remain trapped in their abusive relationships. When mutual orders are issued despite the fact that both parties did not commit acts of domestic violence and abuse "a message is sent from the court that somehow the actions of the victims warrant the issuance of a restraining order against them."[7] When an improper mutual order is entered, instead of holding the batterer accountable for his violence, the law presumes that both parties are equally culpable for and capable of stopping the violence.[8]

Although many people believe that victims of domestic violence can easily leave an abusive home or relationship, this is not necessarily true.[9] Violent relationships are characterized by substantial power disparities that make leaving very difficult, particularly for women with children.[10] Victims courageous enough to take the first step in overcoming all these obstacles by seeking protective orders do not deserve to be subjected to further fear and intimidation by the court.

Furthermore, restraining the rights of domestic violence victims will significantly undercut the vital sense of control and well-being that many victims experience after applying for protective orders.[11] Studies have shown that the mere act of applying for a protective order is associated with helping victims improve their sense of well-being and control. In one study, for example, over 70 percent of the participants reported an immediate improvement in their lives, while in follow-up interviews that proportion increased to 85 percent; 80 percent reported that they felt safer.[12]

---

6. *See* Joan Zorza, *What is Wrong With Mutual Injunctions?*, Domestic Violence Rept. 67 (June/July 1999).

7. Catherine F. Klein, *Full Faith and Credit: Interstate Enforcement of Protection Orders Under the Violence Against Women Act of 1994*, 29 Fam. L.Q. 253, 267 (1995).

8. *See* Zorza, Id. at footnote 6.

9. *See* Sara M. Buel, *Fifty Obstacles to Leaving, A.K.A. Why Victims Stay*, 28 Colo. Law. 19 (1999).

10. *See* Ethan Brennan Lauer, *Housing and Domestic Abuse Victims: Three Proposals for Reform in Minnesota*, 15 Law & Ineq. 471,

477 (1997) (describing how "violent relationships are characterized by 'great power disparities' ").

11. *See* Jeffrey Fagan, *The Criminalization of Domestic Violence: Promises and Limits* (1995) (noting that protective orders provide the benefits of being victim-initiated, timely, and offering "a wide range of specific interventions or relief that addresses extralegal concerns of safety and economic being").

12. *See* Susan Keilitz, et al., *Civil Protection Orders: Victims' Views on Effectiveness*, U.S. Dep't of Justice (1998).

Subjecting victims to court restrictions and jail time for contact with their abusers, particularly since it is so often initiated by the abuser, would inject fear and uncertainty at precisely the point when it is most critical for victims to experience a sense of control over their own lives and be able to trust in the judicial system. As a California Court of Appeal stated

> [t]oday we do little more than require that trial courts follow the letter of the law ... In so doing, we exhort them to recognize that an improvidently issued mutual restraining order may adversely impact victims of domestic violence and continue their victimization. *Monterroso v. Moran,* 135 Cal.App.4th 732, 738, 37 Cal.Rptr.3d 694 (2006).

(Appellant's brief pp. 15–18).

▮ Although our opinion is based upon the fact that the court erred in granting a mutual DVO in contravention of the clear meaning and intent of the law, we further note that the court also entered the order without providing Kimberly with a hearing. This issue was recently addressed by the court in *Wright v. Wright,* 181 S.W.3d 49 (Ky.App.2005). In *Wright* this court held that a trial court was mandated to hold a full hearing as required by statute. When a trial court does not provide a hearing, an individual's due process rights are violated. *Id.* at 53.

For the foregoing reasons, we reverse the opinion of the Marion Circuit Court and remand this case to the Marion District Court with instructions to vacate the DVO entered against Kimberly.

ALL CONCUR.